DAISY CREWS v. PROVIDENT FINANCE COMPANY.

(Filed 1 November, 1967.)

**1. Damages § 3—**

    As a general rule, damages for mere fright or emotional disturbance are not recoverable unless there is a contemporaneous physical injury resulting from defendant's conduct, which injury defendant could have reasonably foreseen under the circumstances.

**2. Same— Evidence held sufficient to overrule nonsuit on question of damages for physical injury resulting from emotional disturbance.**

    Plaintiff's evidence was to the effect that she was an uneducated, old Negro woman who was suffering from high blood pressure and a heart condition, that defendant's collecting agent knew of her condition, that after she had paid the total amount alleged due in claim and delivery papers served on her furniture, and thus retained her furniture, the collecting agent called at her residence, insisted she owed more, used abusive language, and threatened to have her arrested, that immediately after the agent left the premises she went back to her kitchen and resumed preparation of dinner when she suffered a heart attack, with further expert testimony that upon physical examination of plaintiff the next day she was suffering with acute angina, that her blood pressure had risen, and that the collecting agent's visit could have caused this condition. *Held:* The evidence was sufficient to overrule defendant's motion to nonsuit, defendant's evidence in conflict being disregarded in passing upon the motion.

APPEAL by plaintiff from *Bickett, J.,* March 1967 Civil Session, VANCE Superior Court.

    The plaintiff alleged that she had borrowed money from the defendant, executed her note for the debt and secured it with a chattel mortgage upon her household furniture. When she failed to make the required monthly payments, the defendant caused claim and delivery papers to be issued to obtain possession of the plaintiff's furniture. The plaintiff was $45.00 in arrears at the time. When the papers were served on 24 August 1965, the plaintiff paid off the $45.00 plus $5.00 cost; and the claim and delivery papers were marked paid in full. She alleged that two days later Reid H. Jones, the agent of the defendant, came to her home and informed her that she still owed the sum of $244.90 on the note. She replied that she had the claim and delivery papers marked "paid in full" and that she was sick and unable to work. Thereupon, Jones became very angry, cursed the plaintiff and threatened to have her arrested and jailed if she would not pay the $244.90. She alleged that as a result of Jones' improper conduct and threats, she became nervous and excited; that she was already suffering from a heart condition which was thereby aggravated; that she became sick, was required to take medicine and have bed rest; and that she will suffer perm-

anent and irreparable injury as a result of the acts of the defendant. She sued to recover $500.00 actual damages and $5,000.00 punitive damages.

The defendant denied any improper conduct and moved that the cause be dismissed.

Upon the trial, the plaintiff testified that prior to the event she had borrowed money from the defendant and had been required to secure a loan with a chattel mortgage on her household furniture, bedroom suite, and other things. She did not state the exact amount borrowed but testified that her payments were to be $25.00 per month. She further said that when the claim and delivery papers were served on her "they told me how much they wanted and I got exactly what they wanted. They wanted $50.00. I . . . paid them exactly what they wanted. After I paid the $50.00 I thought that was taken care of in full. I had done got glad. . . . Two days later Reid Jones, agent for Provident Finance Company, came to my house at 509 Clark Street. I think it was about 4:30 or 5:00 in the afternoon that he came there, I know I was cooking supper. The children ran in and told me who was there and I went to the door glad to meet him because I did not owe him I thought. He asked if that was all I thought I owed him. I told him that was all the paper required. He asked me where did I get the money to pay them, the $50.00 I had paid them on claim and delivery two days before. I did not tell him; I just thought it was none of his business if I paid him. When I told him that he said that he had to have more money. He said then 'You have to pay more, you owe more.' I said 'That is all the paper required, and I gave you exactly what you asked for, what you wanted.' Then he said 'I have to have more or I will have your damned ass up.' He turned around and went to the car. I went on back in the kitchen and [*sic*] then and tried to cook supper; I got hot and had sharp pains in my chest. When he told me he was going to have . . . [me arrested] I did not say nothing to him; I thought I was all right with him. When Reid Jones told me he was going to have . . .[me] arrested he was not talking easy; he was talking loud. As a result of him talking to me at first I was all right because I did not owe him anything; I thought that paper settled everything, you know, and after he talked that way then I began to feel funny, so nervous I could not get in the kitchen. . . . I was standing in the door, and Mr. Jones was on the porch and Diane Thomas was there. After he finished talking and went toward his car, he went off the porch and was going so fast I thought he was going by the car, and thought he was going to have me up. I knew he was because he was in such a hurry. After he left I went back in the kitchen and tried to cook supper but my heart was

about to burn up; a different feeling in my heart up here, something like sharp pains. I could not finish cooking supper that night. I was in the kitchen going around and when I knew anything they had come in there and were taking me up and I did not know nothing until next morning. Next morning I went to Dr. Green. Dr. Green examined me all over. He prescribed some pills for me. I had to buy some medicine that Dr. Green prescribed. It had been so long I have forgotten a lot of it but when I got back home I went to taking the medicine. I had to go to bed. I had to lay down after I got back home that day and the next day too. Prior to August 26, 1965, Reid Jones had been to my house and collected money before. I had not been able to pay him every time. I told him why I could not pay him; I get some Social Security from my husband every month and I paid with that when I had it. I told him and Mr. Joe too when I stayed on Red Hill that I had heart trouble. He knew this prior to August 26, 1965, the day he came to my house and told me he was going to have me up, but I guess he had forgotten it."

Diane Thomas, the plaintiff's granddaughter, testified that she was present and heard the conversation between Reid Jones and her grandmother; that the plaintiff told him she had paid what the officer required when serving the claim and delivery papers; and that she heard the vulgar threat made by Jones. She said that when Daisy started to talk Jones told her to shut up; that the plaintiff was shaking and after Jones left "Daisy went back in the kitchen and started cooking, but the next thing I knew she was laying on the floor. . . . It was about five minutes after Reid Jones left that I found Daisy laying on the floor. I laid her on the bed and gave her her aspirin and heart medicine. I next carried Daisy to Dr. Green. I left Daisy at Dr. Green's office and got the prescription filled and went back to Dr. Green's office and carried her home and put her to bed. She had to go back to the doctor because she was dizzy and would fall. Prior to August 26, 1965, Daisy was not dizzy and would not have falling out spells." She testified that Jones knew Daisy had a heart condition because her grandmother had told him she could not work because she had heart trouble and was taking heart pills.

Dr. James P. Green testified that when the plaintiff came to his office "she was nervous and suffering with acute angina, nervous, trembling in speech and emotionally disturbed. I tried to find out from her what caused this condition. I had been treating Daisy Crews prior to this time. I had been treating her for hypertension, high blood pressure, heart disease. When she came in on August 27, 1965, I took her blood pressure. According to my record her blood pressure was 220/100. Prior to this we had been able to hold her

blood pressure to around 170 to 180. Prior to August 27, 1965, I had never treated her when she was in the state that she was in when she came in on August 27. In the course of my treatment of Daisy Crews, I do not have any history of her passing out prior to August 27. I prescribed a sedative and increased the dosage of her blood pressure medicine. Her blood pressure stayed around 220/100 about two weeks before it came back to 180. I have an opinion as to what caused Daisy Crews' blood pressure to increase. If the jury should find from the evidence, and by its greater weight that Reid Jones on the evening of August 26, 1965, visited the home of Daisy Crews and threatened to have her arrested, and told her . . ., I have an opinion satisfactory to myself as to whether this could have caused this increase in her blood pressure. My opinion is that in light of the fact her blood pressure had shown no symptom similar to that I saw on August 27, 1965, that it could have, some traumatic experience could have. I have an opinion satisfactory to myself as to whether or not this increase in blood pressure and emotional disturbance of Daisy Crews on August 27, 1965, will cause her irreparable damage. I have followed her up and up to this time it has caused irreparable damage. It has caused a suffering from chronic anxiety. To my knowledge this heart condition has existed in Daisy Crews for about three years."

At the conclusion of the plaintiff's evidence, the defendant moved for judgment as of nonsuit which was denied.

The defendant offered the testimony of Reid H. Jones who said he was employed by the defendant at the time in question and that he had known the plaintiff and had had transactions with her in 1965; that he had asked about the condition of her health and that she had said it was good; that he would not have made the loan unless she was in good health and that she had never told him otherwise. He stated that he had seen her ten or more times during 1965 because her payments were past due, and that she had made many promises to pay but had not done so. He said he called the plaintiff by telephone on July 19 and she hung the telephone up on him; that he then had claim and delivery papers issued, and that her account was marked off the books. That on August 26 her account was up to date and the next payment was due on September 6; that his purpose in going to the place where the plaintiff lived on August 26 was to see her daughter, Dorothy Thomas, who was three months past due on her account. He then said, "When I arrived I knocked on the door and Daisy [Crews] answered, and I asked to speak to Dorothy and she walked into the next room and I talked to Dorothy. I did not have any conversation with Daisy Crews that day. I did talk to Dorothy Thomas. . . . The only conversation I had with

CREWS *v.* FINANCE COMPANY.

Daisy Crews was to ask to speak to her daughter. . . . I never had any harsh words with Daisy Crews. At no time. And she did not at any time give me any excuse about her health. Never told me she was in anything but good health."

On rebuttal, the plaintiff denied having hung up the telephone on Jones and repeated "I told him I had paid everything I owed and he said 'No, you owe me more,' and I said, 'No, I don't,' and he said, 'If you don't pay me more I am going to. . . .' "

At the close of all the evidence, the Court granted the defendant's motion for judgment as of involuntary nonsuit, and the plaintiff appealed.

*Bobby W. Rogers, Attorney for plaintiff appellant.*
*Watkins and Edmundson by R. Gene Edmundson; Pittman, Staton and Betts by William W. Staton, Attorneys for defendant appellee.*

PLESS, J. This is a case of an uneducated old colored woman who, according to the accepted case on appeal, borrowed $70.00 from the defendant. The record is vague, and she probably borrowed more, but the defendants have not seen fit to show how much money she actually got. They are apparently content to let the record be explicit that she gave a chattel mortgage on her furniture for $244.90.

The defendant is not charged with usury, but the record is remindful of the saying "if you got it, you don't need it — if you need it, you don't got it!"

The plaintiff testified that she had paid up her arrearages on the chattel mortgage and that when Reid H. Jones, representing the defendant, came to her home two days later she had no fears and was glad to see him. Her happiness was short-lived for he demanded more and threatened her in vulgar language. His threats and demeanor caused her to get hot and have sharp pains in her chest. She began to feel funny and nervous; her heart was about to burn up with sharp pains; she was going around and did not know anything until the next morning. Jones knew she had had heart trouble before this.

Dr. James P. Green testified that when he saw her the next morning "she was nervous and suffering with acute angina, nervous, trembling in speech and emotionally disturbed." Her blood pressure had gone from 170/180 to 220 and stayed at 220 for two weeks. In answer to a hypothetical question, he gave it as his opinion that Jones' visit and threat could have caused this condition and that it "will cause her irreparable damage."

Jones denied any kind of threat or mistreatment of the plain-

tiff. He said that his call at her house was not to see the plaintiff but to collect more money out of her daughter.

In the light most favorable to the plaintiff — as it must be considered — we have a case in which a sickly, uneducated, old lady is threatened in vulgar language with imprisonment which causes her to have an acute angina attack, raises her blood pressure 40 points and does her heart irreparable damage.

As a general rule, damages for mere fright are not recoverable; but if there is a contemporaneous physical injury resulting from defendant's conduct, there may be a recovery. *Slaughter v. Slaughter,* 264 N.C. 732, 142 S.E. 2d 683.

It is also required that the defendant might have foreseen that some injury would result from his conduct or that consequences of a generally injurious nature might have been expected. In view of plaintiff's evidence that Jones had previous knowledge of her heart condition, we are of the opinion that there was evidence of foreseeability sufficient to meet this requirement.

*Kirby v. Stores Corp.,* 210 N.C. 808, 188 S.E. 625, is probably the leading case in North Carolina on this subject. In that case the defendant's bill collector, in attempting to collect a past due account from the plaintiff, sat in his car and shouted abusive language to plaintiff and threatened to get the sheriff to arrest her. Plaintiff was far advanced in pregnancy, which fact was known to defendant's agent; and the fright caused by the collector's language and threats resulted in the premature stillbirth of plaintiff's child. The plaintiff testified that she became frightened because of this conduct and recovered damages on that account. The defendant claims that this case is not applicable since the plaintiff did not testify that she was frightened as in the *Kirby* case; however, she did testify that she was mad, and we do not interpret *Kirby* as limiting recovery to cases of fright.

98 A.L.R. 402, dealing with this question, says:

"Under § 436 of the American Law Institutes Restatement of the Law of Torts, under the heading, 'Physical harm resulting from emotional disturbance,' it is stated: '(1) If the actor's conduct is negligent as violating a duty of care designed to protect another from a fright or other emotional disturbance which the actor should recognize as involving an unreasonable risk of bodily harm, the fact that the harm results solely through the internal operation of the fright *or other emotional disturbance* does not protect the actor from liability. (2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to

fright, shock, *or other similar and immediate emotional disturbance*, the fact that such harm results solely from the internal operation of fright *or other emotional disturbance* does not protect the actor from liability.'" (Emphasis supplied.)

Madness or anger to the extent of causing an acute angina condition and substantially increasing the blood pressure must certainly qualify as an "emotional disturbance." In fact, Webster defines *mad* as "aroused or controlled by intense emotion" and "furious because of abnormal excitation."

The rule does not require that "physical injury" be visible, such as a cut or a broken arm, and it cannot be questioned that nervousness requiring bed rest brought on by an acute attack of angina and increased blood pressure constituted physical injury.

Upon the plaintiff's evidence that Jones had long known of her heart condition, coupled with the other features referred to above, we are of the opinion that it required that the case be submitted to the jury.

Reversed.